

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FRANK SPEARS                                    CIVIL ACTION

VERSUS                                          NUMBER: 04-2622

JO ANNE B. BARNHART,                            SECTION: "J"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits.  (Rec. docs. 8, 9).

Frank Spears, plaintiff herein, filed the subject applications for DIB and SSI benefits on October 4, 2001, alleging disability as of September 10, 2001.  (Tr. pp. 68-70, 79).  In a Disability Report completed by plaintiff on that same date, he identified high

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

blood pressure, HIV, hepatitis C, and liver problems as the conditions resulting in his inability to work.  (Tr. pp. 78-87). Those conditions first began bothering plaintiff on May 31, 2001 and ultimately rendered him unable to work on September 10, 2001. (Tr. p. 79).  Plaintiff's applications for Social Security benefits were denied at the initial level of the Commissioner's administrative review process on January 17, 2002.  (Tr. pp. 33-37).   Pursuant to his request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on October 8, 2002 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified.  (Tr. pp. 380-401).   On January 24, 2003, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 25-32).  Plaintiff appealed the latter decision to the Appeals Council ("AC") which, on June 13, 2003, remanded the matter back to the ALJ for a resolution of various issues.  (Tr. pp. 51-54).

Following the remand, the ALJ held a second hearing on February 5, 2004 at which plaintiff and a different VE appeared and testified.  (Tr. pp. 402-429).  On May 20, 2004, the ALJ issued a second written decision in which he again concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 8-16).  The AC subsequently denied plaintiff's request for

2

review of the ALJ's decision, thus making the ALJ's decision the
final decision of the Commissioner.  (Tr. pp. 4-6).  It is from
that unfavorable decision that the plaintiff seeks judicial review
pursuant to 42 U.S.C. §405(g).

    In his cross-motion for summary judgment, plaintiff frames the
issues to be reviewed as follows:

   1.   whether the Administrative Law Judge's decision
        that the plaintiff can work at the medium
        exertional level is supported by substantial
        evidence.

   2.   whether the Administrative Law Judge's finding that
        plaintiff's testimony is not credible is supported
        by substantial evidence.

                                             (Rec. doc. 8, p. 2).

    Relevant to the issues to be decided by the Court are the
following findings made by the ALJ:

   1.   [c]laimant met the disability insured status
        requirements of the Act as of the alleged onset
        date and continues to meet them through December
        2003.

   2.   [t]here is no proof that claimant has engaged in
        substantial gainful activity since October 4, 2001.

   3.   [c]laimant has HIV disease, hepatitis A and C, and
        depression which are more than "non-severe".  Stone
        v. Heckler, 752 F.22 1099 (5th Cir. 1985).

   4.   [c]laimant's impairments and/or combination of
        impairments do not meet or equal the criteria of
        any impairment in the Listing of Impairments of
        Appendix 1, Subpart P, Regulations No. 4, including
        but not limited to Sections 12.04 and 14.08.

                                   3

5.   [c]laimant's assertions as to pain, functional
     limitation[s] and the complete inability to do work
     are not substantiated by [the] record evidence and
     are not credible.

6.   [c]laimant has the residual functional capacity to
     perform up to a wide range of medium work with
     certain    non-exertion[al]    restrictions,    as
     aforementioned.

7.   [c]laimant's impairments and residual functional
     capacity preclude him from doing his past relevant
     work as a printing press operator, cook, houseman,
     and presser.

8.   [t]here are a significant number of jobs in the
     national economy that claimant is capable of
     performing such as assembler, production inspector,
     and non-constructor laborer; Rules 203.12 and
     203.04 of the Medical-Vocational Guidelines also
     confirm a finding of "not disabled".

9.   [c]laimant has not been under a "disability" as
     defined in the Social Security Act at any time
     through the date of this decision.

                                        (Tr. pp. 15-16).

     Judicial review of the Commissioner's decision to deny DIB or

SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries:

(1)  whether  substantial  evidence  of  record  supports  the

Commissioner's decision, and (2) whether the decision comports with

relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292

(5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir.

1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the

Commissioner's findings are supported by substantial evidence, they

are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson

                              4

v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.    Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.    Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).    Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled within the meaning of the Social Security Act.    Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A).   Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of

5

performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

    1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

    2. an individual who does not have a "severe impairment" will not be found to be disabled.

    3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

    4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

    5. if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga,

810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th

Cir. 1985)).    Once the Commissioner demonstrates that the

individual can perform other work, the burden then shifts back to

the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362,

1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

At the time of the administrative hearing held on February 5,

2004, plaintiff was fifty-five years of age and had completed

eleven grades of formal education.  Plaintiff testified that he

weighed 146 to 147 pounds, down from 210 pounds, which he

attributed to an inability to keep solid food down and diarrhea

caused by his prescribed medications.  He also testified that his

weight had dropped to as low as 119 pounds in June of 2003 when he

was reportedly treated on an in-patient basis for dehydration and

malnutrition.    At that point in the hearing, the ALJ referred

plaintiff to medical records documenting his weight at 147 pounds

on September 12, 2002 and 142 pounds in 2001, there being no

significant weight loss since the alleged disability onset date.

In terms of job history, plaintiff had last worked as a

houseman at a local hotel from November of 2001 to February/March

of 2002 when he was unable to continue on with the job due to its

physical demands and the adverse effects of his prescribed

medications.  Prior to that job, plaintiff had worked as a press

operator for a newspaper company, a computer part manufacturer, and

a cook.  He had no driver's license.  Plaintiff testified that his prescription regimen had him taking 14 pills in the morning and 12 in the evening, with the mixture of his HIV and hypertension medication leaving him chronically fatigued and constantly in need of bed rest. He still cooked for himself and performed household chores but those tasks took much longer than they used to. Plaintiff estimated that he could walk less than 1 mile before he experienced leg cramps from the ankles up.  He was unable to stand for an hour at a time, quickly becoming tired and having to sit or lie down.  Plaintiff saw his doctor every other week to manage his health problems.  He had reportedly been hospitalized in June of 2003 for malnutrition, dehydration, and cocaine abuse which had started in February of that year.  Upon being questioned by his attorney, plaintiff testified that he experienced stomach problems and forgetfulness due to his HIV and hepatitis C and that medication side effects included nausea, diarrhea, and a lack of energy.  Plaintiff had reportedly been counseled against driving a car or operating machinery.  (Tr. pp. 404-424).

Mary Ellen Kelly, a VE, was next to take the stand.  She first classified plaintiff's past job as a printing press operator as medium, skilled work; his job as a houseman as heavy, unskilled work; and, his job as a computer part manufacturer as medium, skilled work.  The ALJ then posed a hypothetical question to the VE

8

which assumed an individual of plaintiff's age and educational experience who was limited to medium level work with no specified postural maneuvers, away from machinery and irritants, and was relatively stress-free and involved only simple job instructions. In light of those restrictions, the VE testified that the described individual would be unable to perform any of plaintiff's past work. However, the individual could function as an assembler, production inspector/examiner, or non-construction laborer, with significant numbers of such jobs existing in the national and local economies. However, if the hypothetical individual had to lie down for four to six hours per eight-hour workday, there would be no work that the person could perform. Upon being tendered to plaintiff's counsel for further questioning, the VE additionally testified that the medication side effects of severe fatigue and chronic diarrhea, if frequent enough, would render the described individual unemployable. (Tr. pp. 424-429).

The relevant medical records admitted in the administrative proceedings below begin with treatment notes from the Truman Medical Center ("TMC") dated May 3, 2001. Plaintiff complained of a skin rash on the legs and recalled a forty-year history of smoking 2 packs of cigarettes per day and consuming 24 beers and a half gallon of scotch per day. He had supposedly quit drinking 1 month earlier and had stopped using heroin 15 years earlier.

9

Plaintiff's blood pressure was 170/100 at the time and he weighed 148.8 pounds  Plaintiff expressed an interest in getting tested for STD's, having engaged in unprotected sex.  He was prescribed various medications and was advised to stop smoking.  (Tr. p. 145).

The testing done by TMC subsequently revealed that plaintiff was suffering from HIV and hepatitis B.  (Tr. pp. 141-144).  He returned to TMC on May 31, 2001 and his blood pressure had dropped to 139/75.  Medication was prescribed and additional tests were ordered and run.  (Tr. pp. 130-140).  Plaintiff was seen again at TMC on June 6, 2001 and reported that the HCTZ which had been prescribed for his hypertension had resolved his feelings of light-headedness.  Plaintiff's hypertension was described as controlled but he had not managed to quit smoking and declined to discuss the issue.  (Tr. p. 131).  He had no complaints when he was next seen at TMC on June 14, 2001.  Plaintiff advised the doctor at that time that he had lost significant weight in the previous year, weighing over 200 pounds at one time. Plaintiff's CD4 count was 192 and prophylaxis treatment was to begin as well as re-testing for hepatitis C.  Medications were prescribed.  (Tr. p. 130). Plaintiff's hepatitis C test came back as positive.  (Tr. p. 129). He received HIV counseling at TMC on July 2, 2001.  (Tr. p. 128).

When plaintiff returned to TMC on July 19, 2001, he weighed 145 pounds and his blood pressure was 138/72.  He was anxious to

10

start HAART treatment for his HIV.  Despite having a good appetite, plaintiff had not gained any weight.  Plaintiff was to start on Combivir and Sustiva in addition to his regular medications.  The diagnosis was HIV/AIDS, hepatitis C, and hepatitis B.  Additional tests were conducted.  (Tr. pp. 120-127).  Plaintiff had no complaints when he was next seen at TMC on August 30, 2001 and he was said to be tolerating his medicine well.  His weight was down to 140.5 due to a poor appetite but he was using dietary supplements on the side. Plaintiff's medications were refilled and he was scheduled for various tests prior to his next clinic visit. (Tr. p. 119).

On September 24, 2001, plaintiff was seen at the Medical Center of Louisiana at New Orleans ("MCLNO") for follow-up care. Plaintiff advised the staff that he had lost fifty pounds in the previous eight months due to a diminished appetite.  His weight at the time was 137.5 pounds and he also reported occasional fatigue. Plaintiff's last alcohol usage had been 2½ months earlier.  The assessment was AIDS with a CD4 reading of less than 200. Plaintiff's medications were adjusted, a treatment plan was implemented, and additional testing was conducted.  (Tr. pp. 175-192).

Plaintiff returned to MCLNO on October 2, 2001 for follow-up care.  His weight had increased to 142 pounds and he reported being

11

compliant with his medications, having an improved energy level, and living independently. (Tr. pp. 172-174). In an effort to rule out depression, plaintiff underwent a mental health evaluation at MCLNO on October 12, 2001. On mental status exam, plaintiff was alert and oriented but reported feeling depressed, having difficulty with sleep, an overwhelming sense of sadness, and anxiety over a lack of independence. Plaintiff's speech and affect were somewhat subdued and he was near tearfulness. The assessment was an adjustment disorder with anxiety, depression, and alcohol and drug dependence by history. The plan was to follow up with a psychiatrist. (Tr. p. 170).

On November 19, 2001, plaintiff underwent a consultative psychiatric evaluation by Dr. Emanuel DeFraites. Plaintiff complained of being depressed since he was diagnosed as HIV positive. He advised the doctor that he took medication to sleep, had a poor appetite with 45 to 50 pounds of weight loss, had difficulty with memory and concentration, and had feelings of guilt. Plaintiff also related seeing a psychiatrist, Dr. Carol Pindaro, who had prescribed Wellbutrin, Prozac, and Elavil. His past history was positive for psychiatric treatment for six years after he was incarcerated in 1974. In terms of work history, plaintiff reported that he had last worked as a press operator for a newspaper company and, prior to that, as a cook. Plaintiff had

12

a depressed and worried affect throughout the interview but had logical, coherent, goal-directed speech and was oriented in all spheres. He also had a good fund of knowledge, could do complex calculations and abstract proverbs, and had a good memory. Dr. DeFraites' diagnosis was as follows: Axis I - mood disorder secondary to AIDS and alcohol dependence, full sustained remission; Axis III - AIDS, hypertension, and hepatitis C, by history. Plaintiff recalled a fairly average range of daily activities but maintained that he was unable to find a job, that employers often discriminated against HIV+ individuals, and that his prescribed medications left him incapable of working. (Tr. pp. 146-148).

On November 30, 2001, an Administration physician reviewed the medical records then extant and measured those findings against the criteria set forth in Listings 12.04 and 12.09 of the Listing of Impairments. There, the doctor found that plaintiff suffered from only a mild degree of limitation in the activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace. (Tr. pp. 149-162). The doctor also completed a "Mental Residual Functional Capacity Assessment" form in which she concluded that plaintiff had no significant limitations due to a mental impairment. (Tr. pp. 163-166).

By February 21, 2002, plaintiff's medications included

13

Combivir, Sustiva, HCTZ, Effexor, Marinal, MUI, PegIntron, Ribavirin, Phenergan, Prevacid, Megace, and Ibuprofen. (Tr. p. 167). On that same date, a social worker from MCLNO's HIV Outpatient Program ("HOP") filled out a standardized administrative form entitled "Medical Report On Adult With Allegation of Human Immunodeficiency Virus (HIV) Infection." On that form, the social worker checked off boxes indicating that plaintiff suffered from "hepatitis, resulting in chronic liver disease manifested by appropriate findings (e.g., persistent ascites, bleeding esophageal varices, hepatic encephalopathy)." He additionally checked off boxes indicating that plaintiff had a marked restriction in the activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. In the "remarks" section of the form, the social worker noted again that plaintiff suffered from hepatitis C, was on Procrit, and had a CD4 reading of greater than 168 on January 28, 2002. (Tr. pp. 193-197).

On April 2, 2002, plaintiff was consultatively evaluated by Dr. Miljana Mandich, an internist. In providing his medical history, plaintiff stated that his illnesses had first manifested themselves in April of 2001 when he fainted at work without warning and was subsequently hospitalized for three days for treatment of

14

high blood pressure and a kidney infection. After being diagnosed as HIV+ and with hepatitis C, plaintiff began taking anti-retroviral drugs and, subsequently, Interferon and Ribavirin. A liver biopsy reportedly done at the end of 2001 revealed "a little inflammation" but no cirrhosis. Plaintiff reported being constantly depressed since starting on the Interferon. His daily activities at the time consisted of staying home doing household chores, cooking, and walking his dog. Plaintiff advised Dr. Mandich that he had quit drinking in December, had used intravenous drugs from the age of 12 until 1986, and had smoked upwards of 2½ packs of cigarettes per day since the age of 8.

Plaintiff complained of frontal headaches 3 times per week, significant weight loss in the previous 2 or 3 years, nausea, and occasional fatigue, nervousness, and trouble with sleeping. On physical examination, plaintiff was measured as weighing 139 pounds and had 120/80 blood pressure. Neurologically, muscle bulk, tone, and strength were preserved in all extremities and sensation and reflexes were normal. On mental status examination, plaintiff was oriented in all spheres, displayed adequate cooperation and appropriate mood and behavior, and had intact memory and insight. Dr. Mandich diagnosed plaintiff as suffering from: 1. HIV; 2. chronic hepatitis C, by history, with plaintiff being on Rebetron and Interferon since late 2001; 3. depression secondary to

15

Interferon, by history; 4. hypertension, well-controlled with medication; and, 5. a history of alcohol abuse and intravenous drug use from the age of 12 until 1986. In the doctor's opinion, her physical examination of plaintiff was completely unremarkable except for some slightly decreased breath sounds suggestive of hyper-inflation secondary to plaintiff's lengthy history of smoking. In conjunction with her evaluation of plaintiff, Dr. Mandich completed a form provided to her by the Administration entitled "Medical Source Statement of Ability to do Work-Related Activities (Physical)." There, the doctor checked off pertinent boxes on the form indicating that plaintiff had no physical limitations whatsoever. (Tr. pp. 198-208).

Plaintiff was next seen at MCLNO's ID/HIV Outpatient Clinic on April 18, 2002. His weight was 143 pounds at the time and his blood pressure was measured at 132/73. Plaintiff complained of nausea, cramps, abdominal pain, and generalized body pain but had a normal appetite and energy level and was functioning independently. The diagnosis was HIV+, anemia, and side effects from PegIntron. Based on a CD4 reading of 168 and plaintiff's complaints of nausea and cramps, he was referred to a nutritionist and his medications were adjusted. (Tr. pp. 266-268). Plaintiff has no complaints when he was next seen at the MCLNO Clinic on April 25, 2002 with his weight being 144 pounds and his blood

16

pressure being 120/74.  He received his regular injections of
Procrit and PegIntron at this time. (Tr. pp. 263-265).

When plaintiff returned to MCLNO on May 23, 2002, his weight
had risen to 150 pounds but his blood pressure had also increased
to 166/98.  He complained of intermittent nausea relieved by
Phenergan, a diminished appetite, occasional fatigue, and myalgia.
Plaintiff was to continue with his prescribed medications and an
appointment with the nutritionist was made.  Injections of Procrit
and PegIntron were administered.  (Tr. pp. 255-258).

At his next follow-up visit to MCLNO on June 27, 2002,
plaintiff complained of persistent pain in his lower extremities
and shoulders, fatigue, anxiety, a productive cough, chills and
night sweats for the previous week, and occasional pain to the
right side of the mid-abdomen. Plaintiff weighed 144.5 pounds, his
blood pressure was 174/100, and his CD4 level was 52, down from 126
on the previous visit.  His appetite was described as good as was
his energy level.  Plaintiff was prescribed Oxycodone for pain, his
medications were adjusted, and he was administered his regular
injections. (Tr. pp. 251-253).  By July 11, 2002, plaintiff's
weight was up slightly to 147.5 pounds and his blood pressure was
150/88. He had an "OK" appetite and energy level but complained of
pain below the ankles and intermittent epigastric burning.
Plaintiff also expressed frustration with a delay in scheduling his

17

disability hearing. Depression was noted. Medications were prescribed and administered. Among those were Procrit which was observed to be controlling plaintiff's anemia. (Tr. pp. 242-250). On that same date, plaintiff agreed to participate in a study being conducted by the Tulane University Medical Center entitled "Retroviral Coinfections: HIV, HTLV and Drug Abuse." (Tr. pp. 209-213).

Plaintiff's weight was unchanged when he was next seen at MCLNO on July 18, 2002. His energy and functional levels were said to fluctuate but his appetite was good. Plaintiff's complaints at the time were bilateral ankle and right shoulder pain which he described as a "8½" on a scale of 1 to 10. He was still independent in the activities of daily living, denied being depressed, and was still smoking 2½ packs of cigarettes per day. (Tr. pp. 237-240). Plaintiff's joint pain had improved by July 25, 2005, his energy level was good, and he was "doing generally OK." Injections of Procrit and PegIntron were administered. (Tr. pp. 233-236). By August 1, 2002, plaintiff's weight had risen to 150 pounds but his blood pressure had also gone up to 172/110. He complained of low energy, headaches, occasional diarrhea, ankle pain, occasional numbness, and insomnia. However, plaintiff continued to function independently and his appetite was good. Medications were monitored and administered. (Tr. pp. 229-232).

18

Plaintiff had foot pain on a scale of "6" when he returned to MCLNO for follow-up care on August 8, 2002. His appetite was good but he was anxious about his financial situation. Notwithstanding the largely unremarkable findings, plaintiff rated his comfort level at only a "2." He was continued on his medication regimen which by then included Oxycodone and Ibuprofen. (Tr. pp. 225-228). Plaintiff's blood pressure was 170/100 on September 5, 2002. He complained of chills, fever, cold-like symptoms, constant nausea, and pain in the back and ankles. Plaintiff was still living independently and was riding a bike for exercise but continued to smoke 2 packs of cigarettes per day. The dosage of Norvasc was increased in an effort to better control plaintiff's hypertension. (Tr. pp. 220-224). Plaintiff had a productive cough, intermittent shortness of breath, chills, night sweats, and back pain on September 12, 2002. His blood pressure was 176/96. The assessment was bronchitis, possibly pneumonia, and medications were prescribed. (Tr. pp. 217-219). By September 19, 2002, plaintiff's cough and shortness of breath had improved with the use of antibiotics and he was "feeling better." No pain locations were noted and plaintiff's appetite was described as fair but he did complain of feelings of depression for which an appointment with a psychologist was made. (Tr. pp. 215-217). Plaintiff received his regular injections on October 7, 2002 and again on October 15,

19

2002. (Tr. pp. 214, 299).

When plaintiff was next seen at MCLNO on October 24, 2002, his weight was down to 140 pounds and his blood pressure was 160/97. Plaintiff reported a decreased appetite and energy level, off-and-on generalized body aches, and feelings of depression. A follow-up appointment with the nutritionist was to be arranged. (Tr. pp. 296-298).

Plaintiff's next MCLNO visit was not until January 30, 2003 when his weight was 143 pounds and his blood pressure was 168/102. Plaintiff advised examining medical personnel that he had become more depressed since his last clinic visit, had stopped taking his prescribed medications, and had started intravenous use of cocaine. Plaintiff's complaints at the time included muscle aches and pain and abscesses secondary to drug use. Other complaints were fever, chills, a dry cough, feet and leg pain, abdominal pain, diarrhea, occasional swelling of the feet, frequency in urination, and insomnia. Plaintiff was re-started on his medication regimen and was referred to the psychology clinic for treatment of his depression and substance abuse. (Tr. pp. 291-295). The dosage of plaintiff's Effexor was increased on February 4, 2003. (Tr. p. 290).

On February 13, 2003, plaintiff was counseled at MCLNO regarding the effects of cocaine use and depression on his

20

nutritional status.   He was instructed to increase his caloric intake and to drink liquid supplements.  (Tr. p. 289).  Plaintiff reported no relief from the Effexor on February 20, 2003 which was to be gradually discontinued and replaced with another drug.  (Tr. p. 288).   When next seen for follow-up care on March 28, 2003, plaintiff complained of fatigue, nausea, occasional diarrhea, increased frequency in urination, depression, and diffuse aches and pain which he rated as a "9.5."  Various testing and medications were prescribed.   (Tr. pp. 286-287, 280-284).   At his next MCLNO visit on April 23, 2003, it was noted that plaintiff had failed to appear for testing on March 31, 2003 and April 3, 2003.  Presenting problems were fevers, urinary frequency, arthralgias/myalgias, anxiousness, fatigue, poor appetite, and lower back and flank pain which he rated as a "10" and his comfort level as a "0."  Plaintiff denied drug use but he continued to smoke 1½ packs of cigarettes per day.   He was still independent in the activities of daily living and was walking for exercise but had limited mobility by his own report.   Plaintiff's prescriptions were filled and a liver ultrasound was scheduled.   (Tr. pp. 277-279).

Plaintiff was back at MCLNO 2 days later with complaints of low back pain, urinary frequency, decreased appetite and energy level, fevers, sweats, a dry cough, and blurry vision.   He had stopped taking his hepatitis C medication but his other medications

21

were adjusted and Flexeril and Ultram were prescribed.   (Tr. pp. 274-276).  Although the note from plaintiff's next clinic visit on May 1, 2003 indicates that plaintiff's back pain was "a little better," he continued to rate his back, feet, and leg pain as a "10."  Plaintiff weighed 140.5 pounds at the time and his blood pressure was poorly controlled at 178/111.  He was anxious and distressed over his financial situation but continued to function independently in the activities of daily living.  No additional drug use was noted.  Plaintiff's prescriptions were refilled and he was given samples of Vioxx.  (Tr. pp. 271-273).

On June 11, 2003, plaintiff underwent various diagnostic testing, including x-rays of various parts of his body, at the Truman Medical Center ("TMC") in Kansas City, Missouri. A chest x-ray revealed an ill-defined somewhat nodular density left lung base for which a CT scan was recommended to exclude the possibility of a lung nodule/mass lesion.  An x-ray of the left hand revealed diffuse soft tissue swelling and one of the right femur revealed an old fracture deformity but all of the other x-rays were negative. (Tr. pp. 352-377).  Plaintiff was next seen at the TMC Emergency Room ("ER") on July 24, 2003 for a possible insect bite on the back.  The diagnosis was a back abscess for which antibiotics were prescribed.    (Tr.  pp.  341-351).    Follow-up  wound  care  was administered two days later.  (Tr. pp. 337-340).  Plaintiff was

22

next seen at TMC for a more comprehensive workup on July 31, 2003 and stated that he had not been taking his HIV and hepatitis C medications. He weighed 142.5 pounds at the time and his blood pressure was measured at 178/104. Lab work was done and numerous medications were prescribed. (Tr. pp. 331-336). Additional testing was done on August 21, 2003. (Tr. pp. 328-330).

Plaintiff returned to TMC on August 28, 2003 and reported being 100% compliant with taking his medications. His major complaint at the time was an upper respiratory infection with no fever, chills, shortness of breath, or sputum production. The diagnosis was AIDS, hepatis B, hypertension, and an upper respiratory infection. Antibiotics were prescribed in addition to plaintiff's regular medications and blood work was scheduled. (Tr. p. 322). Plaintiff was seen again at TMC on September 25, 2003 but the treatment note is largely unreadable except to indicate that plaintiff weighed 150 pounds and his blood pressure was 183/98. (Tr. p. 321). Plaintiff's weight was unchanged on October 30, 2003 and his blood pressure was 174/96. He was advised to quit smoking. Once again, various medications were prescribed and tests were run for monitoring purposes. (Tr. pp. 316-320).

Plaintiff presented himself at the TMC ER on November 25, 2003 complaining that his liver, kidneys, and flank were hurting for the previous three days. The diagnosis was abdominal pain of uncertain

23

etiology, hematuria, and dermatitis.   Vicodin was prescribed and plaintiff was discharged home in stable condition.   (Tr. pp. 305-315).   The next treatment note from TMC is dated December 4, 2003 but is illegible for the most part.   It does indicate that plaintiff weighed 150.5 pounds, his blood pressure was 162/96, and he was down to smoking ½ of a pack of cigarettes per day.   (Tr. p. 304).   The final medical documentation in the record is dated January 26, 2004 when plaintiff weighed 144 pounds and his blood pressure was 154/88.   He was back up to one pack of cigarette per day.   No diagnosis was given.   (Tr. pp. 302-303).

As noted earlier, plaintiff challenges the Commissioner's decision to deny DIB and SSI benefits on two grounds.   First, plaintiff alleges that the ALJ's determination that he was capable of performing a limited range of medium level work is not supported by substantial evidence.   Plaintiff contends that the evidence supports a finding that he suffers from AIDS, contrary to the ALJ's conclusion in that regard, and that the ALJ failed to provide a function-by-function analysis and appropriate supporting rationale in determining plaintiff's residual functional capacity to work. In his second challenge to the Commissioner's decision, plaintiff alleges that the ALJ failed to give proper weight to plaintiff's subjective complaints.

Just like the ultimate decision of whether or not a claimant

is disabled, the responsibility for determining an individual's residual functional capacity lies with the ALJ.   20 C.F.R. §§ 404.1527(e)(2), (f)(1), 404.1546, 416.927(e)(2), (f)(1), 416.946. Once that determination is made, the ALJ must then decide at the fifth step of the §§404.1520/416.920 analysis whether there are other jobs available that the claimant can perform by relying on expert vocational testimony or other similar evidence.   20 C.F.R. §§404.1561, 416.961;   Fraga, 810 F.2d at 1304. However there must be an evidentiary basis in the record to support such a finding.

The only acceptable medical source to render an opinion about plaintiff's physical capabilities was Dr. Mandich who opined thereon in April, 2002.   She imposed no restrictions after conducting a complete physical examination which produced "completely unremarkable" results.   Plaintiff's treating physicians, both at MCLNO and TMC, never pronounced him disabled at any time or limited his activities in any way. However, it is unclear whether they were asked to opine on those issues.

The Court notes that, initially, the ALJ issued an opinion herein on January 24, 2003 finding claimant had the residual functional capacity to perform heavy work.   That finding was reviewed by the Appeals Council which remanded the matter to the ALJ, with specific instructions.   The AC ordered the ALJ to "obtain evidence from a medical expert, an internist if available, to

25

clarify the nature and severity of the claimant's impairments", if necessary.    Additionally, the ALJ was ordered to provide an "appropriate rationale with specific references to evidence of record in support of the assessed limitations." (Tr. P. 53).

The Court further notes that no doctor performed a functional capacity evaluation of the plaintiff subsequent to the remand of the matter to the ALJ.  The record further reflects that claimant's condition has potentially deteriorated since the rendition of the ALJ's first opinion.  It appears that claimant suffers with anemia and there is now some suggestion in the record that his liver functions have deteriorated.

The Court is, therefore, unable to reach the conclusion which the ALJ reached pertaining to claimant's residual functional capacity to perform medium work based upon the record as currently constituted.    Accordingly, this matter will be REMANDED for purposes of supplementing this record with appropriate medical information, by an internist, pertaining to claimant's residual functional capacity, based upon claimant's current physical condition.

## RECOMMENDATION

For the foregoing reasons, it is recommended that this matter be remanded for supplementation of the record with medical information, from an internist, pertaining to claimant's residual

functional capacity, based upon his current medical condition.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United States Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

Baton Rouge, Louisiana this _2-2_ day of _September_, 2005.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

27